(84 South. 902)

No. 22630.

## COGGIN v. SHREVEPORT RYS. CO.

(May 3, 1920. Rehearing Denied May 31, 1920.)

*(Syllabus by Editorial Staff.)*

1. **Street railroads** ⟶90(5), 99(5)—**Motorman held negligent in failing to slacken speed to avoid jitney, whose driver was not negligent in going on track.**

A street car motorman driving at excessive speed, on seeing a jitney ahead should slacken speed to guard against the contingency of the jitney's swerving on the track temporarily to avoid a horse and buggy, though he had given proper signals by whistle and gong, and the driver of the jitney is not necessarily negligent in going upon the track to avoid the horse and buggy, having looked behind shortly before without seeing any car.

2. **Street railroads** ⟶85(1)—**Street car has no exclusive right.**

Though the right of a street car to use the part of the street occupied by the tracks is paramount, it is not exclusive.

3. **Damages** ⟶130(3)—**Jitney owner entitled to $2,500 for injuries to chest and spine.**

Jitney owner, 59 years old, injured in the chest and lower part of the spine in collision with a street car, subjected to pain and confinement for a time, and rendered unable to do heavy work, though likely to recover sufficiently to do such work as he had been doing, *held* entitled to $2,500 damages.

4. **Street railroads** ⟶115—**Railway liable for repair of jitney damaged in collision.**

A jitney owner, whose car is damaged in collision with a street car, is entitled to recover from the street railway the cost of repairing his car, in addition to his recovery for personal injuries.

O'Niell, J., dissenting.

Appeal from First Judicial District Court, Parish of Caddo; R. D. Webb, Judge.

Action by Eli J. Coggin against the Shreveport Railways Company. From judgment for defendant, plaintiff appeals. Judgment for plaintiff ordered.

Wise, Randolph, Rendall & Freyer, of Shreveport, for appellant.

Foster, Looney & Wilkinson, of Shreveport, for appellee.

PROVOSTY, J. [1, 2] Plaintiff operated a Ford automobile as a jitney on Laurel street in the city of Shreveport. He stopped at the corner of Norma street to pick up a passenger, and then continued on his way. In order to get around a horse and buggy stationed next to the curb on his right just beyond the crossing about 60 feet from where he had stopped for the passenger, he swerved to the left, and in doing so exposed a part of his automobile upon the street car track. He did this without looking behind to see whether a car was coming; but he had looked a moment previously, when stopping for the passenger, and had seen none; but one was coming, and it struck his automobile before he had time to clear the track. A hardly appreciable space of time would have sufficed for him to have cleared the track, and he was in the act of doing so when struck. The motorman had seen him, and had given the proper signals by whistle and gong, but, assuming that he would not go upon the track, had not slackened speed. We think he should have done so, and do not think that the plaintiff was necessarily negligent in going upon the track. The car could not have been so close as some of the witnesses would have it; otherwise plaintiff, whose hearing was unimpaired, could not but have heard both its signals and its other noises in time to stop. We are satisfied that the real cause of the accident was the excessive rate—considerably in excess of the city ordinance speed limit—at which the car was moving, and the fact that the motorman did not slacken this excessive speed, although the situation ahead made him aware that the automobile would have to stop suddenly or swerve towards the track and en-

croach somewhat upon it. Most certainly an automobile driver, before venturing upon the track of a street railway, should look to see whether a car is not coming; but if he has just a moment before taken this precaution, and, judging from the speed at which street cars ordinarily move and from the agility of his own car, he has reason to believe that he may safely venture without looking again, and a collision occurs as the result of a street car having come at excessive speed and in no way slackened speed, although the situation ahead indicated the advisability of doing so, we do not think the blame is to be laid at his door. The right of the street car to use that part of the street occupied by its tracks, though paramount, is by no means exclusive. "In the exercise of these reciprocal rights the company and the traveler on the street are under reciprocal duties, to the extent that the right of each must be exercised with due regard to the right of the other, and in such a careful and reasonable manner as not unreasonably to abridge or interfere with those rights." 36 Cyc. 1493.

Our learned brother below found that plaintiff had been negligent in not looking back a second time, and that this negligence precluded recovery, since it coincided with that of the street car at the moment of the accident, so that the last clear chance rule could not come into play, and that the motorman had the right to assume that the automobile would not go upon the track. This was, we think, applying the law too liberally towards the street car and too strictly against the automobile. Under the circumstances of this case, we think the proximate and legal cause of the accident was the failure of the motorman to slacken his speed to the legal limit. Had he done so, the rapidly moving automobile would have had ample time to clear the track. Moreover, the right of a street car driver to assume that a vehicle upon the street will not go upon the car track has to be exercised with discretion and with due regard to the situation ahead. Thus in the case of Tecklenburg v. Everett, etc., 59 Wash. 384, 109 Pac. 1036, 34 L. R. A. (N. S.) 784, the court said:

"A motorman, seeing a team driving ahead of his car in the same direction he is traveling and parallel with the track, might be justified in assuming that the teamster would not attempt to cross the track at other points than street crossings, but he would not be justified in assuming that the driver would not cross when he reached the intersection of another street, where it might become necessary for him to change his course of travel."

And so, in the case of a motorman who, looking ahead, as in law required to do, sees, or ought to see, that an automobile moving in the same direction may have to venture upon the car track for getting around an obstruction.

Plaintiff was 59 years old, and weighed 160 pounds. His automobile was thrown clear across the sidewalk, against a fence post, and overturned. He did not realize at first that he was hurt, but within a few minutes felt a sudden pain, which necessitated his being taken to his home and put to bed. The injuries were to his breast and lower spine. The former soon healed, but the latter caused him great suffering for about three weeks, during which time he had to remain in bed. Speaking as of the time of the trial, six months after the accident, he described his condition as follows:

"I cannot do anything about the like of work I used to do. Walking around the streets even hurts me, and if I stand on my feet very much I cannot sleep. I don't get easy until 10 or 11 o'clock at night. Some time I can hardly get up when I am down. * * * I have not been able to do any heavy work. I can do a little light work—still I suffer in doing the work or after doing the work."

He has had to discontinue running his jitney.

Dr. Sanderson, who attended plaintiff, testified, as follows:

"I found Mr. Coggin in bed. His pulse was rapid, about 100 to 105. He was extremely nervous, was pale and showed other symptoms of the shock, such as cold, clammy skin, and was complaining very greatly of pain. Now, in examining him, any movement about his hips seemed to cause him great pain. Also a part of his spine, and in turning him to examine him, any other movements also gave him pain in his left chest. He complained of pain also, when he was not being moved, but the pain was increased on movement.

"Well, my diagnosis in the case was that where his pelvis joined the backbone it had loosed the backbone. The backbone is let into the pelvis something like a keystone in an arch. It is a kind of dovetailed joint, and a sudden jar, especially falling on the end of the spine, or doubling up on the knees together, would loosen these sacroiliac joints. Where they are loosened, recovery is seldom ever complete in anybody, and in a man of his age, if they were loosened, and the symptoms were indicated, that he would not ever recover from it. * * *

"If I am correct, I would rather think that under the circumstances, his age, etc., that he would not be able to do hard manual labor."

[3] We do not understand by this that the plaintiff is not likely to recover sufficiently to do such work as he had been heretofore in the habit of doing. In a case like the present there is hardly any rule to go by for fixing the amount of the damages suffered. Plaintiff is entitled to some compensation for the sufferings he endured. Making an estimate as best we can, we fix the amount of the damages at $2,500.

[4] The plaintiff in one part of his testimony says that in repairing his automobile so as to be able to use it he expended $35 in new parts, and did the work himself, and was at it six or eight days; his work was worth $5 a day. In another part of his testimony he says that as thus repaired the car does not run well, because a new axle, costing $55, would be needed; and that the accident necessitated the purchase of a new wheel and tire and inner tube, costing $20.

That the top was "torn all to pieces," and a new one would have to be bought at a cost of $40; and the front axle would have to be straightened at a cost of $3; and new bowls would have to be put in at a cost of $8 to $10. Allowing $8 for the bowls, $3 for straightening the axle, $20 for the wheel, tire, and tube, and $30 for the new top, as the new would in all probability be worth something more than the old, and we have $61, as representing the amount of damage done to the automobile.

It is therefore ordered, adjudged, and decreed that the plaintiff, Eli J. Coggin, have judgment against the defendant, the Shreveport Railways Company, in the sum of $2,561, with legal interest thereon from this date, and that the defendant company pay the costs of this suit.

O'NIELL, J., dissents.